IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>vs.<br><br>FRANCISCO VALENCIA,<br><br>    Defendant. | **AMENDED REPORT AND RECOMMENDATION**<br><br><br><br>Case No. 2:05-CR-895 DAK |

Before the court is a motion to suppress filed by Defendant Francisco Valencia. (File Entry #327.) Defendant seeks to have suppressed all evidence obtained from the September 22, 2005 search of Defendant's person, car, and home, and any statements made by Defendant during that detention and search.

After thoroughly reviewing and considering the parties' pleadings, the court recommends that Defendant's motion to suppress (#327) be denied.

**FACTUAL BACKGROUND**[1]

On August 30, 2005, Taylorsville Detective Stephens arrested a person in possession of narcotics. (File Entry #618, at 1.)

---

[1] The facts upon which the court relies in this case were presented to the court by stipulation. (File Entries #500, 501, 618.)

That person identified his dealer as "Lalo," pointed out the house on Dean Circle where "Lalo" lived, and said that "Lalo" drove a white GMC Yukon.  (File Entry #618, at 1.)  All of this information was provided to Detective Miller before September 22, 2005.  (File Entry #618, at 1; File Entry #500, Exhibit, Police Report, at 1.)  The house in question, located on the west side of Dean Circle, was also identified to Detective Miller.  The address of that house was 4412 South Dean Circle, Apartment B (hereafter "Dean Circle house").  (File Entry #618, at 1; File Entry #500, Exhibit, at 1.)

On September 22, 2005, Detective Miller was on narcotics patrol in the area of Dean Circle when he saw a white Yukon parked on the west side of Dean Circle.  Detective Miller also saw a green Ford Explorer coming and going from the Dean Circle house.  Detective Miller checked the registration on the Explorer and discovered that it was listed as uninsured.  (File Entry #500, Exhibit, at 1.)  When the Explorer left the Dean Circle house, Detective Miller followed it.  Detective Miller then stopped the Explorer due to its registration showing that it was uninsured.  (File Entry #500, Exhibit, at 1.)

As the Explorer stopped, Detective Miller saw the front female passenger make furtive movements by leaning forward towards the front of her seat.  Detective Miller then made contact with the Explorer's driver.  The driver had a Mexico issued identification that identified the driver as Ever Garcia.

Garcia told Detective Miller that he did not have a valid Utah driver's license. Detective Miller was unable to verify if the Explorer was properly insured. (File Entry #500, Exhibit, at 1.)

Detective Miller then arrested Garcia for being an unlicensed driver. In Garcia's wallet, Detective Miller found a fraudulent Social Security card in Garcia's name. Detective Miller described the card as appearing to have been photocopied and then having had the number typed over the top of it. Detective Miller had the female passenger get out of the Explorer so it could be searched incident to Garcia's arrest and prior to impound. The female passenger identified herself as Garcia's girlfriend. She said her name was Elizabeth Munguia and that she was a juvenile. (File Entry #500, Exhibit, at 1.)

During his search of the Explorer, Detective Miller first searched the area where he had seen Munguia making the furtive movements. There Detective Miller found an open can of beer which was cold to the touch. Detective Miller told Munguia she was going to be arrested for possession of alcohol by a minor and open container. Munguia responded that the beer was not hers and she was holding it for her brother. Munguia said her brother was Francisco Valencia. Munguia said her brother lived at the Dean Circle house, and she confirmed that he drove a white GMC Yukon. (File Entry #500, Exhibit, at 1.)

In the Explorer's ashtray, Detective Miller found a bag containing several "twists" of narcotics. There were four twists

of field tested positive methamphetamine, each weighing 0.6 grams, and seven twists containing field tested positive cocaine, each weighing 0.6 grams. Munguia told Detective Miller that she did not know the narcotics were in the Explorer. Garcia told Detective Lance in Spanish that the narcotics were his and that he had obtained them at the club "Rumba." (File Entry #500, Exhibit, at 1.)

A tow truck arrived on the arrest scene and a hold for owner tow of the vehicle was conducted. Garcia was taken to jail. (File Entry #500, Exhibit, at 1.)

Detective Miller drove Munguia back to the Dean Circle house to release her to her mother. As they arrived at Dean Circle, Detective Miller saw the white Yukon drive past him heading towards the Dean Circle house. In his stipulation, Defendant stated that while he was driving the Yukon, he noticed a police vehicle parked on the side of the road and passed it when he was approximately one or two blocks from his residence, the Dean Circle house. (File Entry #501, at 2.) As he proceeded to the Dean Circle house, Defendant noticed that the police vehicle he had passed, along with "several additional police vehicles, with their sirens and lights activated, converged upon his residence." (File Entry #501, at 2.) Detective Miller stopped Defendant in front of the Dean Circle house. (File Entry #500, Exhibit, at 2.)

Defendant then told Detective Miller that he was Francisco Valencia. Detective Miller told Defendant about the information Detective Miller had been given concerning the distribution of narcotics. Defendant said that he did not have any narcotics. Detective Miller then asked Defendant for consent to search the Yukon, and Defendant consented. Defendant also consented to a search of the Dean Circle house, where, he told the officer, he resided. Defendant later identified his room as the one on the northeast corner of the top floor. (File Entry #500, Exhibit, at 2.)

Detectives made contact with Defendant's mother at the door of the Dean Circle house while Detective Miller was talking to Defendant. Those detectives received consent from Defendant's mother to search her residence. (File Entry #500, Exhibit, at 2.)

Detective Miller asked Defendant for permission to search his person for narcotics, and Defendant consented. During the search of Defendant's person, Detective Miller discovered $762.00 of United States currency in Defendant's pants pocket. (File Entry #500, Exhibit, at 2.)

Before searching the Yukon, Defendant revealed that he had a small amount of narcotics in the center console for personal use. Detective Miller looked in the center console and saw a bag containing an off-white crystal-like substance which, through training and experience, Detective Miller identified as

methamphetamine.  A narcotics dog was requested to the scene. The narcotics dog alerted to the presence of narcotics in the Yukon.  Detective Miller took the methamphetamine, which weighed approximately one ounce.  According to Detective Miller's report, a typical user amount is 1/4 gram, which meant the bag contained approximately 112 user amounts of methamphetamine.  (File Entry #500, Exhibit, at 2.)

Detective Miller also conducted the consent search of the Dean Circle house.  In the room Defendant had identified as his bedroom, Detective Miller found what appeared to be cocaine and methamphetamine, including a twist that was the same type of twist Detective Miller had found in Garcia's Explorer.  Detective Miller also found drug paraphernalia and a handgun.  (File Entry #500, Exhibit, at 2.)

Defendant stated the he was an illegal immigrant and confirmed that his nickname was "Lalo."  (File Entry #500, Exhibit, at 2.)

## PROCEDURAL BACKGROUND

After being arrested in the current case, Defendant filed the motion to suppress that is now before the court.  (File Entry #327.)  A hearing was held on the motion on April 24, 2007, at which time Defendant's counsel and the Government informed the court that they were drafting a stipulated set of facts to submit to the court.  (File Entry #492.)  Two of the stipulated

submissions of fact were filed on May 3, 2007.  (File Entries #500, 501.)

On June 8, 2007, the Government filed its memorandum opposing Defendant's motion to suppress.  (File Entry #561.)  On June 13, 2007, Defendant filed his memorandum in support of his motion to suppress.  (File Entry #568.)

Another motion to suppress hearing was held on July 12, 2007.  (File Entry #601.)  At that hearing, the Government requested an opportunity to file a supplemental stipulation of facts, which request the court granted.

The Government filed its additional stipulated facts on July 25, 2007.  (File Entry #618.)  On August 6, 2007, Defendant filed a response to the Government's additional stipulated facts (File Entry #640), and the court took the matter under advisement.

**ANALYSIS**

Defendant seeks to suppress evidence obtained from the search of his person, car, and home.  First, Defendant argues that the stop of him in the Yukon was not justified at its inception.  Second, Defendant argues that the Government has failed to establish the validity of the scope of his detention.  Third, Defendant argues that the Government has failed to adequately establish that Detective Miller received the necessary consent to conduct the warrantless searches of Defendant's person, car, and home. Fourth, Defendant argues that his *Miranda* rights were violated.  Finally, Defendant argues that his

statements were not made voluntarily.  The court addresses each of these arguments in turn, starting with Defendant's challenge of the initial stop.

### A.  Initial Stop

An investigative stop is a seizure within the meaning of the Fourth Amendment and must be justified at its inception.  *See Terry v. Ohio*, 392 U.S. 1, 19-20 (1968).  "It is well settled that an investigative stop is justified where police officers have 'a reasonable, articulable suspicion that the detainee has been, is, or is about to be engaged in criminal activity.'" *United States v. Elkins*, 70 F.3d 81, 83 (10th Cir. 1995) (*quoting United States v. Nicholson*, 983 F.2d 983, 987 (10th Cir. 1993) (citing *Terry*, 392 U.S. at 21)).

"Reasonable suspicion is a 'particularized and objective basis for suspecting the person stopped of criminal activity.'" *United States v. Treto-Haro*, 287 F.3d 1000, 1004 (10th Cir. 2002) (*quoting United States v. Callarman*, 273 F.3d 1284, 1286 (10th Cir. 2001)).  The presence of reasonable suspicion is not determined by any one factor, but by the totality of the circumstances.  *Alabama v. White*, 496 U.S. 325, 330 (1990); *see also United States v. Sokolow*, 490 U.S. 1, 7 (1989) (explaining that whether an officer has reasonable suspicion to initiate a stop is "'not readily, or even usefully, reduced to a neat set of legal rules'").  Determining whether reasonable suspicion exists

requires a court to adopt a "common sense" approach.  *United States v. Williams*, 271 F.3d 1262, 1268 (10th Cir. 2001).

Reasonable suspicion "is dependent upon both the content of information possessed by police and its degree of reliability. Both factors - quantity and quality - are considered in the 'totality of the circumstances - the whole picture.'" *Alabama v. White*, 496 U.S. 325, 330 (1990) (*quoting United States v. Cortez*, 449 U.S. 411, 417 (1981)).  The central question is whether "[b]ased upon the whole picture the detaining officers [had] a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Cortez*, 449 U.S. at 417-18.  Tips, even if anonymous, coupled with independent police work, provide reasonable suspicion to warrant an investigative stop.  *White*, 496 U.S. at 330.

"Reasonable suspicion is a less demanding standard than probable cause not only [because] reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also [because] reasonable suspicion can arise from information that is less reliable than that required to show probable cause." *Treto-Haro*, 287 F.3d at 1004; *see also United States v. Mendez*, 118 F.3d 1426, 1431 (1997) ("[R]easonable suspicion represents a 'minimum level of objective justification.'").

Turning to the instant case, Defendant argues that the stop was not lawful at its inception.  The court concludes that this

9

argument lacks merit because Detective Miller had reasonable suspicion to believe that Defendant was dealing drugs, allowing him to conduct an investigative stop to determine whether his suspicions were correct.  Detective Miller had first received information from a fellow detective that a confidential police informant had disclosed that a person named "Lalo," who was living at Defendant's home, was involved in the distribution of methamphetamine.  (File Entry #500, Exhibit, at 1; File Entry #618, at 1.)  The informant had also disclosed that the same "Lalo" drove a white GMC Yukon.  (File Entry #500, Exhibit, at 1.)  Detective Miller saw a white Yukon parked on the same street as the home in question.  (File Entry #500, Exhibit, at 1.)  Further, when Detective Miller stopped the Explorer, which had just left the home in question, Munguia, the young woman in the Explorer, identified herself as the sister to Francisco Valencia.  (File Entry #500, Exhibit, at 1.)  Munguia told Detective Miller that Francisco Valencia lived at the home in question and drove a white Yukon.  (File Entry #500, Exhibit, at 1.)  In addition, Detective Miller found four twists of methamphetamine, each weighing .6 grams, and seven twists of cocaine, each weighing .6 grams, in the Explorer.  Finally, when Detective Miller was driving Munguia back to the Dean Circle house, the white Yukon drove past Detective Miller towards the Dean Circle house.  (File Entry #500, Exhibit, at 2.)  This information was enough to provide Detective Miller with reasonable suspicion to conduct an

investigative stop of Defendant.  As a result, the court rejects Defendant's argument.

## B.   Scope of Detention

Second, Defendant argues that the Government has failed to establish the validity of the scope of Defendant's detention.

An "investigative detention usually must 'last no longer than is necessary to effectuate the purpose of the stop,' and '[t]he scope of the detention must be carefully tailored to its underlying justification.'"  *United States v. Hunnicutt*, 135 F.3d 1345, 1349 (10th Cir. 1998) (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983)).  However, police may ask additional questions unrelated to the purpose of the stop and lengthen the detention when they either have reasonable suspicion or when they obtain consent.  *See id.*

In this case, Detective Miller limited the initial stop by asking Defendant only one question and then receiving consent to conduct the searches.  In so doing, Detective Miller followed proper procedure for investigative detentions.  He stopped Defendant under the reasonable suspicion that Defendant was engaged in drug trafficking.  He then asked Defendant specifically whether or not he was dealing narcotics.  After Defendant denied that he was dealing drugs, Detective Miller asked Defendant for consent to search his car and residence.  Later, Detective Miller also asked for consent to search Defendant's person.  In each case, as set forth below, Defendant

11

consented to the searches. As a result, the court concludes that Detective Miller did not exceed the scope of the stop.

### C. Consent

Third, Defendant argues that the Government has failed to adequately establish that Detective Miller received the necessary consent to conduct the warrantless searches of Defendant's person, car, and home.

"[A] search conducted pursuant to a valid consent is constitutionally permissible . . . [and] wholly valid." *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973). The Government bears the burden of proving that, under the totality of the circumstances, the person freely and voluntarily gave unequivocal and specific consent. *See id.*; *United States v. Winningham*, 140 F.3d 1328, 1331 (10th Cir. 1998).

The police report provides all the facts presented regarding Defendant's consent. The police report states that when Detective Miller asked Defendant for consent to search the Yukon, Defendant consented. The police report further states that Defendant also consented to a search of the Dean Circle house, where he said he resided, and that Defendant later told the police where to find his bedroom. Detective Miller also asked Defendant for permission to search his person for narcotics, and Defendant consented. (File Entry #500, Exhibit, at 2.)

Although it would be helpful if the facts in this case were more detailed and specific, the court concludes that the facts

presented are adequate to establish that Defendant's consent was freely and voluntarily given. When Detective Miller first asked Defendant if he could search the Yukon, Defendant had been stopped for a brief time. *See Schneckloth*, 412 U.S. at 226 (stating length of detention is a factor to be considered in evaluating consent). Consent was obtained each time near Defendant's home, in public view, with family members nearby. No evidence has been presented, including by Defendant in his Stipulation on Testimony of Francisco Valencia (File Entry #501), that officers at any time drew weapons, touched him, or otherwise physically threatened him. In addition, although the facts indicate that other officers were present during the encounter, apparently only Detective Miller questioned Defendant. No evidence has been presented that Detective Miller used an insisting tone or manner with Defendant. No evidence has been presented that Defendant equivocated in giving his consent to search his car, his residence, or his person, nor is there any indication that Defendant was subjected to repeated or prolonged questioning. Moreover, Defendant has not presented evidence showing that he was unusually susceptible to coercion, that he was confused or intimidated by the situation or somehow misunderstood the requests for consent, and nothing in the facts suggests that the officers acted improperly, abusively, or coercively.

Instead, the stipulated facts indicate Defendant simply consented to Detective Miller's request to search the Yukon, and then he voluntarily explained that some narcotics were located in the center console of the Yukon for his personal use.  In addition, the facts indicate that when Detective Miller asked for consent to search Defendant's residence, Defendant simply consented, and then later told the officer where his bedroom was located.  Finally, when Detective Miller asked Defendant for consent to search Defendant's person, the facts indicate that, again, Defendant simply consented.  Each time Defendant consented he was unrestrained, near his home, and near family members, who were also home.  The court finds that, based on the totality of the circumstances in this case, Defendant's consent was freely and voluntarily given and was unequivocal and specific.[2]

---

[2]The Government also argues that Defendant's mother's consent provides a separate basis for the police to conduct the warrantless search of the Dean Circle house.  However, the facts regarding Defendant's mother's consent do not provide the court with the necessary information for the court to determine whether Defendant's mother possessed common authority over the Dean Circle house, particularly Defendant's bedroom, including whether she had mutual use of the property by virtue of joint access or control for most purposes over it.  *See United States v. Matlock*, 415 U.S. 164, 171 (1974) (holding third parties can consent to a warrantless search when they possess common authority over the premises or other sufficient relationship to the premises or effects sought to be inspected); *United States v. Rith*, 164 F.3d 1323, 1329 (10th Cir. 1999) (stating "a third party has authority to consent to a search of property if that third party has either (1) mutual use of the property by virtue of joint access, or (2) control for most purposes over it").  Although there is a presumption that parents have control for most purposes over an adult child's bedroom when that child lives with them and does not pay rent, *see id*. at 1331, the facts do not disclose whether

14

**D.   *Miranda***

Finally, Defendant argues that his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), were violated, and that as a result, the statements he made should be suppressed.  "'[T]wo requirements must be met before *Miranda* is applicable; the suspect must be "in custody," and the questioning must meet the legal definition of "interrogation."'"  *United States v. Bennett*, 329 F.3d 769, 774 (10th Cir. 2003) (quoting *United States v. Perdue*, 8 F.3d 1455, 1463 (10th Cir. 1993)).

For purposes of *Miranda*, in determining whether an individual was in custody, "a court must examine all of the circumstances surrounding the interrogation, but 'the ultimate inquiry is simply whether there [was] a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.'" *Stansbury v. California*, 511 U.S. 318, 322 (1994) (per curiam) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam) (citation omitted)); *accord*, *United States v. Jones*, 933 F.2d 807, 810 (10th Cir. 1991); *United States v. Chalan*, 812 F.2d 1302, 1306 (10th Cir. 1987), *cert. denied*, 488 U.S. 983 (1988).

---

Defendant paid his mother rent or otherwise had some sort of agreement with her that she was allowed to freely enter his bedroom.  The Government simply has not met its burden to provide the court with sufficient facts to enable it to make the determination whether Defendant's mother could consent to the search of Valencia's bedroom.

15

"To measure the degree of restraint on the freedom of a suspect's movement, a court must examine 'how a reasonable man in the suspect's position would have understood his situation.'" *Chalan*, 812 F.2d at 1306 (quoting *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984)). Under these circumstances, an objective, reasonable-person test has been deemed appropriate, as opposed to a subjective test, because it does not "'place upon the police the burden of anticipating the frailties or idiosyncracies of every person whom they question.'" *Berkemer*, 468 U.S. at 442 n. 35 (citation omitted).

In addressing whether Defendant was subjected to a custodial interview, "the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury*, 511 U.S. at 323. The subjective views of the officer "concerning the nature of an interrogation, or beliefs concerning the potential culpability of the individual being questioned," may be considered in assessing "whether that individual was in custody, . . . only if the officer's views or beliefs were somehow manifested to the individual under interrogation and would have affected how a reasonable person in that position would perceive his or her freedom to leave." *Id.* at 325.

In this case, Defendant was not restrained at any time during the encounter. The officers never used force or the

16

threat of force against him.  Defendant had not committed any traffic violation and was not told that he was being held for that purpose.  The officers never told Defendant that he was under arrest.  Indeed, Defendant was free to move about at the time that he made statements to the officers.  Further, although the facts indicate that at least two officers were present for at least part of the encounter, apparently only Detective Miller spoke to Defendant.  In addition, the encounter took place in and near Defendant's own residence.  *See United States v. Ritchie*, 35 F.3d 1477, 1485 (10th Cir. 1994) (explaining that fact that interrogation took place in familiar surroundings, such as suspect's residence, weighed against determination that suspect was in custody).  The court concludes that the totality of the circumstances in this case indicates a non-custodial encounter.

Because the court concludes that Defendant was not "in custody," the requirements of *Miranda* did not apply.  As a result, the court rejects Defendant's *Miranda* argument.

### E.  Voluntariness

In order to be admissible, a statement made by a defendant to law enforcement officers must be voluntary, whether or not the defendant was in custody.  The Government bears the burden of establishing by a preponderance of the evidence that a statement was voluntary.  *See Lego v. Twomey*, 404 U.S. 477, 489 (1972); *United States v. McCullah*, 76 F.3d 1087, 1100 (10th Cir. 1996).  The test for determining the voluntariness of a statement is
17

whether, under the totality of the circumstances, law enforcement obtained the statement by overbearing the will of the accused. *See Dickerson v. United States*, 530 U.S. 428, 434 (2000); *Haynes v. Washington*, 373 U.S. 503, 513 (1963); *United States v. Erving L.*, 147 F.3d 1240, 1248-49 (10th Cir. 1998); *United States v. Glover*, 104 F.3d at 1570, 1579 (10th Cir. 1997).

In deciding whether the statement was obtained by overbearing the accused's will, courts focus on the conduct, if any, of law enforcement officers in creating pressure, and the individual's ability to resist such pressure. *See Mincey v. Arizona*, 437 U.S. 385, 399-402 (1978); *Davis v. North Carolina*, 384 U.S. 737, 752 (1966). Stated another way, the issue is whether the defendant's will was overborne and the capacity for self determination critically impaired. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 225-26 (1973); *McCullah*, 76 F.3d at 1101. Coercive police activity is a necessary element for finding involuntariness. *See Colorado v. Connelly*, 479 U.S. 157, 167, 170 (1986); *Glover*, 104 F.3d at 1580; *United States v. Robertson*, 19 F.3d 1318, 1321 (10th Cir. 1994). The police must "overreach by exploiting a weakness or condition known to exist." *Robertson*, 19 F.3d at 1321.

Turning to the instant case, the court concludes that Defendant's statements were voluntary. The totality of the circumstances does not support that Defendant's statements were

obtained by overbearing Defendant's will or as a result of coercive police activity.  As already set forth above, although the facts indicate that other officers were present during the encounter, apparently only Detective Miller questioned Defendant.  No evidence has been presented that Detective Miller used an insisting tone or manner with Defendant, nor is there any indication that Defendant was subjected to repeated or prolonged questioning.  In addition, Defendant has not presented evidence showing that he was unusually susceptible to coercion, that he was confused or intimidated by the situation or somehow misunderstood Detective Miller's questions or requests, and nothing in the facts suggests that the officers acted improperly, abusively, or coercively.  Defendant was not restrained at any time during the encounter.  The officers never used force or the threat of force against him.  Furthermore, the encounter took place in and near Defendant's home with family members close by.

Under the totality of the circumstances, the court concludes that the Government has met its burden of establishing by a preponderance of the evidence that Defendant's statements were voluntary.

### RECOMMENDATION

Based on the foregoing analysis, **IT IS HEREBY RECOMMENDED** that Defendant Francisco Valencia's motion to suppress (**File Entry #327**) be **DENIED**.

Copies of the foregoing report and recommendation are being mailed to the parties who are hereby notified of their right to object to the same.  The parties are further notified that they must file any objections to the report and recommendation, with the clerk of the district court, pursuant to 28 U.S.C. § 636(b), within ten (10) days after receiving it.  Failure to file objections to both factual and legal findings may constitute a waiver of those objections on subsequent appellate review.

DATED this 21st day of September, 2007.

BY THE COURT:

_____
Samuel Alba
United States Chief Magistrate Judge